J-A01033-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: TERMINATION OF PARENTAL RIGHTS TO  A.P.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.L.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1005 MDA 2021 |

Appeal from the Decree Entered July 1, 2021
In the Court of Common Pleas of Centre County Orphans' Court at No(s):
2021-4518 A

| | | |
|---|---|---|
| IN RE: TERMINATION OF PARENTAL RIGHTS TO M.S.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.L.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1006 MDA 2021 |

Appeal from the Decree Entered July 1, 2021
In the Court of Common Pleas of Centre County Orphans' Court at No(s):
2021-4519 A

| | | |
|---|---|---|
| IN RE: TERMINATION OF PARENTAL RIGHTS TO K.P.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.L.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1007 MDA 2021 |

Appeal from the Decree Entered July 1, 2021
In the Court of Common Pleas of Centre County Orphans' Court at No(s):
2021-4520 A

BEFORE:  LAZARUS, J., NICHOLS, J., and KING, J.

MEMORANDUM BY NICHOLS, J.:          **FILED: FEBRUARY 9, 2022**

S.L.L. (Mother) appeals from the decrees terminating her parental rights to M.S.H., born in July 2015, A.P.H., born in October 2016, and K.P.H., born in September 2018 (collectively, Children), under 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).[1]  We affirm.

The trial court summarized the factual and procedural history of this case as follows:

> On September 7, 2019, Centre County Children and Youth Services (CYS) received a referral regarding domestic violence and threats to [Children] in Mother's home.  CYS conducted a home visit with police and spoke to Mother, who had a bruised face.  Mother stated she had an argument with [Father] and was living with Mother at the time, but Mother denied any allegations of abuse.  During a walkthrough of Mother's residence, CYS noted the water was not working in the home and there were hygiene concerns about the condition of the home.  Mother agreed to a safety plan, which prohibited Father from being in the home or around the Children, while CYS attempted to find separate housing for Mother.  [CYS] filed for emergency custody of the Children on September 10, 2019.  Despite agreeing to the safety plan, Mother allowed Father to remain at the residence.
>
> On or about September 18, 2019, CYS received a second referral alleging domestic abuse.  Father was arrested and charged for the alleged domestic violence, which involved hitting Mother with a firearm.  After Father's arrest, Mother stopped working with CYS and the charges against Father were dropped when Mother disputed the allegations and refused to cooperate with police.  On September 30, 2019, CYS filed for emergency protective custody of the Children.  Both Mother and Father refused to submit to drug tests requested by CYS at the time.  On October 9, 2019, the Children were adjudicated dependent.

---

[1] On July 1, 2021, the court also terminated the parental rights of H.H. (Father).  ***See*** Final Order and Decree, 7/1/21, at 1.  Father has not appealed.

While in the care of CYS and their foster families, the Children disclosed repeated incidents of domestic violence occurring in the home between Mother and Father. The Children also reported the water was not working in the home, they were forced to defecate in bags, ate out of the trash, and were occasionally left at home alone. CYS confirmed the Children's reports through interviews and therapy sessions with the Children. The Children also had significant dental issues which required fillings, crowns, and dental work to address infections. [Children] were enrolled in therapy with Pamela McCloskey, [M.Ed.] to address their issues with anxiety.

Mother was offered biweekly parent meetings and visits with the Children. Mother regularly attended meetings and visits, but [she] failed to follow through on services outside of these sessions. All visits were supervised[,] and CYS staff often had to step in to assist as Mother had difficulty engaging with all three Children. Mother refused to address or discuss any incidents of domestic violence even when the Children raised the issue during visits. Mother obtained a separate residence, but [she] maintained her relationship with Father. In February 2020, Mother told CYS that her relationship with Father had ended, but Mother maintained contact with Father despite telling CYS she had no contact with him. Father was observed at Mother's home on several occasions and dropped Mother off at a doctor's appointment. Mother also listed Father as her emergency contact in June 2020.

Mother was provided reunification services through Family Intervention Crisis Services (FICS) between May 29, 2020 and February 4, 2021. CYS attempted to provide Mother with mental health services when the Children were first removed from the home in October 2019, but Mother did not begin mental health services until April 2020 because she failed to return calls and schedule appointments. Mother began therapy with Choices Clinical Counseling in April 2020 after being discharged in October 2020 after having difficulty scheduling and regularly attending in-person sessions. Although Mother informed FICS that she was on a waiting list, CenClear reported they did not know who Mother was and had never heard from her. Mother was also supposed to attend monthly trauma therapy sessions with Pamela McCloskey starting in July 2020, but [she] failed to schedule a session until October 2020. Mother then began the intake process with Expressions Counseling Services on November 30, 2020, but Expressions did not hear from Mother again until January 2021.

FICS also had difficulty conducting lifestyle checks at Mother's home as only eight successful checks occurred out of fifty-one attempts. Mother also showed up to visits in October and December 2020 with bruises on her face, which she attempted to cover with her hair. Mother claimed she fell down at her grandmother's home in October and failed to catch a box her mother threw at her when they were wrapping presents in December.

On February 2, 2021, CYS filed a Petition for Involuntary Termination of Parental Rights of Mother and Father. A hearing was held on June 30, 2021. The court entered an order terminating Mother's parental rights on June 30, 2021.

Trial Ct. Op., 8/13/21, at 1-3 (some formatting altered).[2]

Mother timely appealed and raises the following issues for our review:

1. Did the [trial] court err in involuntarily terminating Mother's parental rights where CYS did not prove by clear and convincing evidence all of the elements required to effectuate an involuntary termination pursuant to 23 Pa.C.S. § 2511(a)(2)?

_____

[2] On June 25, 2021, Parviz Ansari, Esquire, the guardian *ad litem* for Children, filed a petition requesting that he his employer, the Centre County Public Defender Office, be appointed as counsel for Children's legal interests. *See* Petition, 6/25/21, at 1-2; *see In re Adoption of K.M.G.*, 240 A.3d 1218, 1223-24 (Pa. 2020) (stating "[a]s we have previously recognized, [23 Pa.C.S. §] 2313(a) requires that the common pleas court appoint an attorney to represent the child's legal interest, *i.e.* the child's preferred outcome, and the failure to appoint counsel constitutes structural error in the termination proceedings" (citation and quotation marks omitted); *see also In re: T.S.*, 192 A.3d 1080, 1088 (Pa. 2018) (counsel appointed to represent the legal interests of a child in involuntary termination of parental rights proceeding could also represent the child's best interests, where the child's legal and best interests did not diverge). Mr. Ansari averred that he had spoken to Children and that their stated preferences did not conflict with their best interests. *Id.* Mr. Ansari further averred that he had discussed the appointment with all counsel of record and unrepresented parties and there were no objections to the appointment. *Id.* On June 30, 2021, the court granted the petition and entered an order appointing the Office as legal counsel and finding that there was no conflict of interest. *See* Order, 6/30/21, at 1.

2. Did the [trial] court err in involuntarily terminating Mother's parental rights where CYS did not prove by clear and convincing evidence all of the elements required to effectuate an involuntary termination pursuant to 23 Pa.C.S. § 2511(a)(5)?

3. Did the [trial] court err in involuntarily terminating Mother's parental rights where CYS did not prove by clear and convincing evidence all of the elements required to effectuate an involuntary termination pursuant to 23 Pa.C.S. § 2511(a)(8)?

4. Did the [trial] court err in involuntarily terminating Mother's parental rights where CYS did not prove by clear and convincing evidence all of the elements required to effectuate an involuntary termination pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 4 (some formatting altered).

In reviewing an appeal from an order terminating parental rights, we apply the following standard of review:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. [*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)]. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where

the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

The burden is on the petitioner "to prove by clear and convincing evidence that [the] asserted grounds for seeking the termination of parental rights are valid." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id.* (citation omitted).

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b) . . . .

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We need only agree with the court as to any one subsection of Section 2511(a), in addition to Section 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

- 6 -

## Involuntary Termination Under Section 2511(a)(2)

Initially, we review the trial court's ruling under Section 2511(a)(2) which provides:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> > (2) The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being and the condition and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.[ ] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

***In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted).

Further, "[t]he grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." ***In re Adoption of C.D.R.***, 111 A.3d 1212, 1216 (Pa. Super. 2015) (citation omitted). "Parents are required to make diligent

- 7 -

efforts towards the reasonably prompt assumption of full parental responsibilities." **In re A.L.D.**, 797 A.2d 326, 340 (Pa. Super. 2002) (citations and quotation marks omitted).

Mother argues that CYS failed to prove by clear and convincing evidence that Mother demonstrated parental incapacity that was not remedied to resolve the issues which resulted in placement. Mother's Brief at 14. She avers that she was making sufficient progress towards resolving the issues which brought Children into placement and should be allowed to continue those efforts. **Id.** at 14-15. Mother contends that she resolved and remedied many of the issues. **Id.** at 15. Specifically, Mother points out that she attended visitations, maintained a sober lifestyle, attended therapy, maintained a clean and safe residence, and is no longer in a relationship with Father. **Id.** at 15-21. Mother claimed that she has not had contact with Father since April, 2020. **Id.**; **see also** N.T. Termination Hr'g, 6/30/21, at 132-43.

The trial court discussed this section as follows:[3]

> Mother has demonstrated a repeated and continued incapacity, neglect, and refusal that has caused [Children] to be without essential parental care, control, and subsistence necessary for [their] physical and mental well-being. Mother has demonstrated an inability to appropriately care for the physical, emotional, and mental well-being of [Children]. Mother knew [Children were] witnessing domestic violence and at risk of physical, emotional,

---

[3] Mother filed three notices of appeal at separate dockets. The trial court issued separate Pa.R.A.P. 1925(a) opinions at each docket, although the facts and analysis in each opinion were nearly identical. On August 23, 2021, this Court consolidated the appeals *sua sponte.* For ease of analysis, we have quoted one opinion and altered the formatting to refer to Children rather than each individual child.

and mental abuse by remaining in the home with Father, but Mother took inadequate steps to ensure [Children were] removed from that behavior. Mother was aware [Children were] suffering from anxiety as a result of [their] home life, but [she] failed to take appropriate actions to address [their] emotional and mental issues. Mother failed to provide a safe, stable, and sanitary environment for [Children]. [Children] would be left home alone [when they were only one, three, and four] years old at the time. Mother's home did not have running water and the Children reportedly resorted to defecating in bags and eating food from the trash. Mother demonstrated an inability to perform parental duties for [Children] through her actions and her refusal to act in [Children's] best interests.

Mother was offered a number of services, including reunification services, for over a year in order to improve and demonstrate her ability to properly care for [Children]. Although Mother regularly attended meetings and visits with [Children], she repeatedly failed to take part in services intended to improve her situation with the goal of reunification. Mother failed to schedule and attend the services offered by CYS and FICS, such as mental health and trauma counseling. During visits with the Children, Mother failed to appropriately acknowledge and address the emotional and mental difficulties the Children were experiencing. Mother also repeatedly exhibited an inability to appropriately engage with and care for all of the Children.

The conditions and causes of incapacity, abuse, neglect and refusal have not been and will not be remedied by Mother. Mother has failed to recognize the problems which led to [Children's] placement, and never took significant action to remedy the concerns CYS and FICS had about [Children] remaining in or returning to Mother's care. Mother did not properly avail herself of the services offered by the agencies, and failed to show she had made progress in reaching goals necessary for reunification. Mother did not sufficiently progress in her goals or show improvement in her parenting ability. Mother continuously failed to schedule, attend, and engage with reunification services, and lifestyle checks and assessments by CYS and FICS were repeatedly missed.

Trial Ct. Op., 8/13/21, at 5-7.

The record indicates that the trial court's findings are supported by testimony and evidence introduced at the termination hearing. CYS presented the testimony of CYS caseworkers Ryan Clancy, Jaclyn Conway, and Austin Garlitz, and reunification specialist Joni Hubler.

Ms. Hubler testified that on several occasions Mother had extensive bruising on her face and was dishonest about the way she had been injured. N.T. Termination H'rg, 6/30/21, at 79-81. Ms. Hubler reiterated that Mother was not able to meet Children's needs during their visits, including taking them to the bathroom or calming them when they struggled with their emotions. *Id.* at 82. At one visit, A.P.H. was hurt by his sibling throwing a toy, and Mother did not even acknowledge that the incident had happened. *Id.* at 83. When A.P.H. attempted to discuss the domestic violence incidents he had witnessed, Mother would not answer him. *Id.* at 84. Though Mother attended the visits, she could not understand the trauma her children had undergone and was unable to show basic love and affection, physical or otherwise, to them. *Id.* at 86-87, 96. Mother made no progress alleviating any concerns regarding domestic violence. *Id.* at 89.

Ms. Conway testified that

[d]uring this extensive period of time that [Children] have been in placement, [Mother] has, again whether it's an inability or unwillingness, not been able to provide what the [C]hildren need. There hasn't been an overall acknowledgement of the trauma that they experienced in her care, on her watch. She's demonstrated just an inability at times to even engage with them verbally, even during very minimal entirely supervised visits. Throughout the lifetime of the case, we have not seen [Mother] make necessary progress to even be able to have good, quality visits with her

- 10 -

children without significant involvement from reunification counselors. If she cannot do that, I have significant concerns about her ability to parent [Children,], and again, we saw such a significant delay in her setting up services and then the commitment to the trauma counseling that she was participating in, which was crucial, because she certainly has her own significant history and background which led us here, led her to [Father,] led us here to this hearing where we are today . . . .

*Id.* at 61-62. Despite repeated discussions and warnings, Mother continued to see Father during the pendency of the case and reunification services. *Id.* at 41-46.

Based on the foregoing review of the record, we find support for the trial court's findings that while Mother attended visits, she failed to complete her goals for reunification and was unable to demonstrate an ability to maintain stability for herself and Children. More importantly, the record shows that despite extensive coaching and assistance, Mother was not able to apply the parenting skills she had been taught and could not engage verbally with Children. The record supports the trial court's findings of fact regarding Mother's incapacity or refusal to remediate the deficiencies that caused Children to be without essential parental care, control, or subsistence; and that the causes of the incapacity or refusal were not remedied by Mother. Accordingly, this Court will not disturb the trial court's findings. *See S.P.*, 47 A.3d at 826-27. Therefore, we conclude that the trial court's termination of Mother's parental rights pursuant to Section 2511(a)(2) was within its discretion and free of legal error in that it was supported by clear and convincing evidence in the record.

## Section 2511(b) Determinations

Section 2511(b) states:

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

This Court has stated that the focus in terminating parental rights under Section 2511(a) is on the parent, but the focus of Section 2511(b) is on the child.  **See In re C.L.G.**, 956 A.2d 999, 1008 (Pa. Super. 2008).  In reviewing the evidence in support of termination under Section 2511(b), our Supreme Court has stated as follows:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b).  The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability."  In **In re E.M**., 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child.  The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

**In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013) (some citations omitted).  "A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights."  **In re Z.P.**, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *Id.* (citations omitted) Further, "in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (citation omitted).

We note that "[i]t is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority." *In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa. Super. 2017) (citation omitted). Where "an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." *Id.*

In the instant case, Mother's argument regarding Section 2511(b) is, at best, boilerplate. Mother's Brief at 30. She avers that she incorporates all of her prior arguments addressing Section 2511(a)(2), (5), and (8), and merely repeats the statutory requirements for Section 2511(b). *Id.* In her argument regarding Section 2511(a)(2), she argues that there was a bond between Mother and Children "as evidenced by their interactions at Mother's numerous visits," and that no bonding evaluation or expert analysis was offered by CYS. *Id.* at 26. However, Mother does not cite to the portions of the record that

would support this argument. Accordingly, we find that she has waived her claim regarding Section 2511(b). *See M.Z.T.M.W.*, 163 A.3d at 465-66.

However, even if we did not find waiver, this claim would be meritless, and we would conclude there was no abuse of discretion. With regard to Section 2511(b), the trial court noted:[4]

> Here, the [c]ourt found CYS provided clear and convincing evidence that [all three Children are] doing very well in [their] foster home[s]. [Children have] not been subject to any of the domestic abuse [they were] viewing and experiencing in Mother's home. [Children have] benefitted from regular counseling and shown major improvement in appropriately regulating [their] emotions and behavior. The foster parents have been able to appropriately address [Children's] mental and emotional issues in a way which Mother has shown she is unable to do at visits. In Mother's care, [Children] experienced mental and emotional issues resulting from living in an environment where domestic violence was occurring and where basic needs, such as running water, food and proper hygiene, were not being provided. [Children's] physical, emotional and mental well-being [are] being properly cared for and [are] not at-risk in foster care.
>
> . . . In this case, terminating Mother's parental rights would not destroy any existing, necessary or beneficial relationship for [Children. Children have] not been in Mother's care without supervision for over a year and a half. Terminating Mother's parental rights will not mean that she will not be able to continue having a relationship with [Children]. CYS does not plan to all of a sudden cut off all contact between Mother and [Children]. The foster parents have met with Mother on multiple occasions and intend to allow Mother to continue her relationship with [Children]. Terminating Mother's parental rights will not cause irreparable harm to either party and any possible harm can be dealt with

_____

[4] Again, we have combined the court's analyses from three separate opinions as each opinion was nearly identical, with the sole difference being the pronouns and ages of each child.

through services provided by CYS and cooperation with the foster parents.

The foster parents have provided a stable and loving environment for [Children] where [they] have not experienced any of the same difficulties with [their] physical, emotional or mental well-being like [they] did in Mother's care. [M.S.H. and A.P.H. have been] in the same foster home with the same foster parents since shortly after [their] removal from Mother's custody. [K.P.H. has been in the same foster home since his removal from Mother's custody.]. Although [M.S.H. and A.P.H.] are in a separate foster home from [their sibling K.P.H., their] foster parents and the foster parents of [K.P.H.] maintain regular contact and have arranged for them to see each other on a regular basis in the past and intend to continue to do so. [Children and their] foster parents have developed a strong bond with one another. [Children consider their] foster parents [their] mother and father in addition to Mother. It is in the best interests of [Children] to terminate Mother's parental rights, and allow [them] to be adopted by [their] foster parents.

Trial Ct. Op., 8/13/21, at 7-9.

Specifically, Ms. Hubler testified that the bond between Mother and Children was very fractured. N.T. Termination H'rg, 6/30/21, at 87. Ms. Conway testified that she had no doubt that Mother loved Children and that Children love Mother and have a parental bond with her. *Id.* at 58, 64. However,

a lot of their experiences with [Mother] are scary in nature and of [Mother] not meeting their needs and then having to get food from the garbage can and being left alone and being scared and fearful and seeing her hurt and them remaining in that with her. [A reunification specialist testified] that Mother wasn't able to take [Children] to the bathroom or toilet because they had concerns, and they had fears surrounding [Mother].

So while they love their mom, and I do believe that, I believe that relationship is not a safe and secure and trusting one.

*Id.* at 64-65. Ms. Conway noted that K.P.H. had spent the majority of his two-and-a-half years in foster care, and A.P.H. and M.S.H. had also spent significant time in care. *Id.* at 62. She continued that the foster parents were doing an excellent job meeting Children's needs. *Id.* Mr. Garlitz testified that there was a loving relationship between the foster parents and Children, and that their medical, educational, and physical needs were being met. *Id.* at 107.

Ms. Conway did not believe that the breaking of the parental bond would be harmful to Children. *Id.* at 66. Mr. Garlitz believed severing the parental bond might have an impact on Children but testified that CYS would ensure Children remained in counseling and provide services, and that the strong bond with the foster parents would lessen the negative impact of severing Children's bond with Mother. *Id.* at 109. Specifically, Mr. Garlitz noted that Children had "a very loving relationship" with their foster parents. *Id.* at 107.

Ms. Conway and Mr. Garlitz testified unequivocally that, as a result of the above, it was in Children's best interest for Mother's parental rights to be terminated. *Id.* at 61, 110-11. Accordingly, were we to reach this issue, Mother's argument regarding the lack of a bonding evaluation or expert testimony is meritless, as social workers testified extensively regarding the bond and the minimal impact its severance would have on Children. *See Z.P.*, 994 A.2d at 1121.

Based on this record, we discern no abuse of discretion in the trial court's findings of fact or conclusions of law that CYS established the grounds

for termination under Section 2511(b). **See T.S.M.**, 71 A.3d at 267. We acknowledge Mother's argument that she had bonds with Children, which was supported by the record. However, the record further supports the trial court's findings of fact and conclusions of law that Children lacked positive, secure bonds with Mother due to Mother's inability to interact appropriately with them and that termination of Mother's parental rights best advanced Children's developmental, physical, and emotional needs and welfare. **See id.**; **S.P.**, 47 A.3d at 826-27. As this Court has noted, "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." **See In re Adoption of M.E.P.**, 825 A.2d 1266, 1276 (Pa. Super. 2003).

For these reasons, even if we had not found waiver, we would conclude that Mother's claim that the trial court erred in terminating her parental rights under Section 2511(b) lacks merit. Accordingly, we affirm the trial court's rulings under Sections 2511(a) and (b), in that the termination of Mother's parental rights serves the best interests of Children based on clear and convincing evidence.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 02/09/2022